**EXHIBIT 01-7**

**Docket and Complaint**

*Emily Evans v. DeMert Brands, LLC,* **Case No. 1:22-cv-06300**

**United States District Court for the Northern District of Illinois**

Query    Reports    Utilities    Help    Log Out

KIM

# United States District Court
# Northern District of Illinois - CM/ECF NextGen 1.6.3 (Chicago)
# CIVIL DOCKET FOR CASE #: 1:22-cv-06300

Evans v. DeMert Brands, LLC                       Date Filed: 11/10/2022
Assigned to: Honorable Charles P. Kocoras         Jury Demand: Plaintiff
Demand: $75,000                                   Nature of Suit: 370 Other Fraud
Cause: 28:1332 Diversity-Fraud                    Jurisdiction: Diversity

**Plaintiff**

**Emily Evans**                    represented by    **Carl V. Malmstrom**
*individually and on behalf of all others*          Wolf Haldenstein Adler Freeman & Herz
*similarly situated*                                LLC
                                                    111 W. Jackson Blvd.
                                                    Suite 1700
                                                    Chicago, IL 60604
                                                    312-984-0000
                                                    Fax: 212-686-0114
                                                    Email: malmstrom@whafh.com
                                                    *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DeMert Brands, LLC**

| Date Filed | # | Docket Text |
|---|---|---|
| 11/10/2022 | 1 | COMPLAINT *(Class Action)* filed by Emily Evans; Jury Demand. Filing fee $ 402, receipt number AILNDC-20037398. (Attachments: # 1 Civil Cover Sheet)(Malmstrom, Carl) (Entered: 11/10/2022) |
| 11/10/2022 | | CASE ASSIGNED to the Honorable Charles P. Kocoras. Designated as Magistrate Judge the Honorable Young B. Kim. Case assignment: Random assignment. (jb, ) (Entered: 11/10/2022) |
| 11/10/2022 | | CLERK'S NOTICE: Pursuant to Local Rule 73.1(b), a United States Magistrate Judge of this court is available to conduct all proceedings in this civil action. If all parties consent to have the currently assigned United States Magistrate Judge conduct all proceedings in this case, including trial, the entry of final judgment, and all post-trial proceedings, all parties must sign their names on the attached Consent To form. This consent form is eligible for filing only if executed by all parties. The parties can also express their consent to jurisdiction by a magistrate judge in any joint filing, including the Joint Initial Status Report or proposed Case Management Order. (jb, ) (Entered: 11/10/2022) |
| 11/14/2022 | | SUMMONS Issued as to Defendant DeMert Brands, LLC (smb, ) (Entered: 11/14/2022) |
| 11/15/2022 | 2 | ATTORNEY Appearance for Plaintiff Emily Evans by Carl V. Malmstrom (Malmstrom, |

Carl) (Entered: 11/15/2022)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 11/22/2022 09:17:58 | | | |
| **PACER Login:** | carltonf | **Client Code:** | 99998-99991-2309 |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-06300 |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NOTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| EMILY EVANS, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, |  |
| v. | **JURY TRIAL DEMANDED** |
| DEMERT BRANDS, LLC, |  |
| Defendant. |  |

## CLASS ACTION COMPLAINT

Plaintiff Emily Evans ("Plaintiff"), by and through her attorneys, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself, which are based on personal knowledge, against Defendant DeMert Brands, LLC, ("Defendant" or "Demert").

## NATURE OF THE ACTION

1.     This is a class action lawsuit regarding Defendant's manufacturing, distribution, and sale of Not Your Mother's brand dry shampoo products (the "Products") that contain dangerously high levels of benzene, a carcinogenic impurity that has been linked to leukemia and other cancers.

2.     These Products are not designed to contain benzene, and in fact no amount of benzene is acceptable in dry shampoo products such as the Products manufactured, distributed, and sold by Defendant.  Thus, the presence of benzene in the Products renders them adulterated and misbranded, and therefore illegal to sell under both federal and state law.  As a result, the Products are unsafe and illegal to sell under federal law, and therefore worthless. *See* 21 U.S.C. §§ 331(a), 352; *see also Barnes v. Unilever United States Inc.*, 2022 WL 2915629, at *1-3 (N.D.

Ill. July 24, 2022); *Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1085 (11th Cir. 2019); *In re Valsartan, Losartan, & Irbesartan Prod. Liab. Litig.,* 2021 WL 222776, at \*16 (D.N.J. Jan. 22, 2021).

3.      Further, although Defendant lists both active and inactive ingredients on the Products' labels, benzene is not among those ingredients listed.  Thus, Defendant misrepresents that the Products do not contain benzene, or otherwise Defendant fails to disclose that the Products contain benzene.  Plaintiff and other Class Members would not have purchased the Products, or would have paid substantially less for the Products, had Defendant disclosed that the Products contained or risked containing benzene, or otherwise not misrepresented that the Products did not contain or were not at risk of containing benzene.

4.      Benzene is a component of crude oil, gasoline, and cigarette smoke, and is one of the elementary petrochemicals.  The Department of Health and Human Services has determined that benzene causes cancer in humans.  Likewise, the Food and Drug Administration ("FDA") lists benzene as a "Class 1 solvent" that "should not be employed in the manufacture of drug substances, excipients, and drug products because of [its] unacceptable toxicity."  Benzene is associated with blood cancers such as leukemia.[1]

5.      A study from 1939 on benzene stated that "exposure over a long period of time to any concentration of benzene greater than zero is not safe,"[2]  which is a comment reiterated in a 2010 review of benzene research specifically stating: "There is probably no safe level of exposure to benzene, and all exposures constitute some risk in a linear, if not supralinear, and additive

---

[1] National Cancer Institute, Cancer-Causing Substances, Benzene, https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/benzene.

[2] F.T. Hunter, *Chronic Exposure to Benzene (Benzol). II. The Clinical Effects*, 21 JOURNAL OF INDUSTRIAL HYGIENE AND TOXICOLOGY 331 (1939), https://www.cabdirect.org/cabdirect/abstract/19402700388

fashion."[3]

6.     The World Health Organization has stated "[h]uman exposure to benzene has been associated with a range of acute and long-term adverse health effects and diseases, including cancer and haematological effects."[4]

7.     According to the American Cancer Society:

> IARC classifies benzene as "carcinogenic to humans," based on sufficient evidence that benzene causes acute myeloid leukemia (AML). IARC also notes that benzene exposure has been linked with acute lymphocytic leukemia (ALL), chronic lymphocytic leukemia (CLL), multiple myeloma, and non-Hodgkin lymphoma.[5]

8.     The CDC warns that "[b]enzene works by causing cells not to work correctly. For example, it can cause bone marrow not to produce enough red blood cells, which can lead to anemia. Also, it can damage the immune system by changing blood levels of antibodies and causing the loss of white blood cells."  The CDC also cautions that "[d]irect exposure of the eyes, skin, or lungs to benzene can cause tissue injury and irritation."[6]

9.     According to the National Institute for Occupational Safety and Health, humans can become exposed to benzene through "inhalation, **skin absorption**, ingestion, **skin and/or eye contact.**"[7]

---

[3] Martyn T. Smith, *Advances in Understanding Benzene Health Effects and Susceptibility*, 31 ANNUAL REVIEW OF PUBLIC HEALTH 133 (2010), https://www.annualreviews.org/doi/full/10.1146/annurev.publhealth.012809.103646.

[4] https://www.who.int/teams/environment-climate-change-and-health/chemical-safety-and-health/health-impacts/chemicals/benzene.

[5] American Cancer Society. Benzene and Cancer Risk (January 5, 2016), https://www.cancer.org/cancer/cancer-causes/benzene.html.

[6] Centers for Disease Control and Prevention, Facts About Benzene, https://emergency.cdc.gov/agent/benzene/basics/facts.asp.

[7] National Institute for Occupational Safety and Health (NIOSH), Benzene, https://www.cdc.gov/niosh/npg/npgd0049.html (emphasis added).

10.     Due to the substantial harm to humans caused by exposure to chemicals such as benzene, companies have been founded with the specific goal of preventing defective products, containing said harmful chemicals, from reaching consumers. Valisure is a company with a core mission "to independently check the chemical composition of medications and healthcare products before they reach consumers."[8]  In order to do this, Valisure operates an independent analytical laboratory registered with the FDA and accredited by the International Organization for Standardization.

11.     Valisure has tested for specific chemical qualities in numerous types of products, such as N-Nitrosodimethylamine ("NDMA") in ranitidine, NDMA in metformin, benzene in hand sanitizers, benzene in sun care products, and benzene in antiperspirants.  Each time, Valisure's detection of benzene and other carcinogens has been independently confirmed by industry and led to recalls by manufacturers over the subject products.

12.     On October 31, 2022, Valisure tested for benzene in various types of dry shampoos through utilizing gas chromatography and detection by mass spectrometry ("GC-MS") instrumentation that allows mass spectral separation.  GC-MS "is generally considered one of the most accurate analyses available."[9]  Indeed, the FDA used the same method to test for impurities list benzene in hand sanitizers.[10]

13.     After conducting this testing, Valisure "detected high levels of benzene in specific

---

[8] Valisure, Valisure Detects Benzene in Body Spray Products (November 4, 2021), https://www.valisure.com/blog/valisure-news/valisure-detects-benzene-in-body-spray-products-3/.

[9] https://www.element.com/materials-testing-services/chemical-analysis-labs/gcms-analysis-laboratories.

[10] https://www.fda.gov/media/141501/download.

batches of certain dry shampoo products."[11]

14. Valisure tested the Not Your Mother's Products manufactured and sold by Defendant, which were found to contain as much as 158 parts per million ("ppm") of benzene[12]:

| Brand | UPC | Lot | Description | First Spray Benzene Concentration (ppm) |
|---|---|---|---|---|
| Not Your Mother's | 688047130500 | 21090 | Beach Babe Texturizing Dry Shampoo – Toasted Coconut – 7 oz | 158 |
| Not Your Mother's | 688047130098 | 21145 | Clean Freak Refreshing Dry Shampoo – Original – 7 oz | 143 |
| Not Your Mother's | 688047130296 | 21070 | Clean Freak Refreshing Dry Shampoo – Unscented – 7 oz | 69.6 |
| Not Your Mother's | 688047130975 | 20356 | Triple Threat Brunette Dry Shampoo – Hint of Brunette Tinted Powder -7 oz | 27.6 |
| Not Your Mother's | 688047130296 | 21188 | Clean Freak Refreshing Dry Shampoo – Unscented – 7 oz | 9.41 |

---

[11] VALISURE, VALISURE CITIZEN PETITION ON BENZENE IN DRY SHAMPOO PRODUCTS, Oct. 31, 2022, https://assets-global.website-files.com/6215052733f8bb8fea016220/ 6360f7f49903987d8f4f4309_Valisure%20FDA%20Citizen%20Petition%20on%20Benzene%20i n%20Dry%20Shampoo%20Products_103122.pdf (the "Valisure Petition"), at 1.

[12] *Id.* at 13.

| Brand | UPC | Lot | Description | First Spray Benzene Concentration (ppm) |
|---|---|---|---|---|
| Not Your Mother's | 688047130517 | 21141 | Plump for Joy Body Building Dry Shampoo – Orange Mango – 7 oz | 132 |
| Not Your Mother's | 688047130500 | 21124 | Beach Babe Texturizing Dry Shampoo – Toasted Coconut – 7 oz | 85.4 |
| Not Your Mother's | 688047130500 | 21179 | Beach Babe Texturizing Dry Shampoo – Toasted Coconut – 7 oz | 73.1 |
| Not Your Mother's | 688047130517 | 21181 | Plump for Joy Body Building Dry Shampoo – Orange Mango – 7 oz | 55.3 |
| Not Your Mother's | 688047130098 | 20280 | Clean Freak Refreshing Dry Shampoo – Original – 7 oz | 51.2 |
| Not Your Mother's | 688047130500 | 21063 | Beach Babe Texturizing Dry Shampoo – Toasted Coconut – 7 oz | 40.1 |
| Not Your Mother's | 688047130296 | 21009 | Clean Freak Refreshing Dry Shampoo – Unscented – 7 oz | 39.5 |
| Not Your Mother's | 688047130951 | 20353 | Blonde Moment Dry Shampoo – Hint of Blonde Tinted Powder – 7 oz | 22.9 |

| Brand | UPC | Lot | Description | First Spray Benzene Concentration (ppm) |
|---|---|---|---|---|
| Not Your Mother's | 688047132290 | 21194 | Clean Freak Refreshing Dry Shampoo – Original – 1.6 oz | 4.46 |

15.     The FDA does state that if the use of benzene is "**unavoidable** in order to produce a drug product with a significant therapeutic advance," then the drug product may contain up to 2 ppm of benzene.[13]  However, Defendant's Products contain levels of benzene above this amount. Regardless, the Products are not designed to contain benzene, as dry shampoo products have long been sold without any sort of benzene contamination.  Moreover, according to Valisure, "the dry shampoos tested are not drugs and contain no active pharmaceutical ingredient for therapeutic purpose; therefore, **any** significant detection of benzene could be deemed unacceptable."[14]

16.     "Furthermore, Valisure shows data from the analysis of benzene by directly sampling contaminated air after spraying dry shampoo products, which suggests potential for short- and long-term inhalation exposure to high levels of benzene.  The presence of this known human carcinogen in dry shampoo products that are regularly used indoors and in large volumes makes this finding especially troubling."[15]

17.     In addition, Valisure tested multiple other brands of dry shampoo products, several of which were found to be "below the lower limit of quantitation,"[16] demonstrating that the

---

[13] *Id.* at 2 (emphasis added).

[14] *Id.* (emphasis added).

[15] *Id.*

[16] *Id.* at 17

Products could have been manufactured without the use of benzene.  Accordingly, **any** level of benzene in Defendants' Products is unacceptable and renders the Products adulterated, misbranded, unsafe, and worthless.

18.     Defendant did not disclose the actual or potential presence of benzene in its dry shampoo products on the Products' labeling, advertising, marketing, or sale of the Products.

19.     Dry shampoos are considered cosmetics that are regulated by the United States Food & Drug Administration ("FDA") pursuant to the federal Food, Drug and Cosmetics Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, as well as analogous state statutes and regulations.  The FDCA prohibits the distribution of cosmetics which are adulterated or misbranded.  A cosmetic is considered adulterated "if it bears or contains any poisonous or deleterious substance which may render it injurious to users under the conditions of use prescribed in the labeling thereof, or under such conditions of use as are customary or usual."  21 U.S.C. § 361(a).

20.     A cosmetic is also adulterated "[i]f it has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health."  21 U.S.C. § 361(c).

21.     A cosmetic is misbranded if "its labeling is false or misleading in any particular," and if its packaging does not bear "a label containing … an accurate statement of the quantity of the contents in terms of weight, measure, or numerical count."  21 U.S.C. §§ 362(a)-(b)(2).  Further, as cosmetics regulated by the FDA, the Products must "bear a warning statement whenever necessary or appropriate to prevent a health hazard that may be associated with the product."  21 C.F.R. § 740.1(a).

22. Any cosmetic product that is adulterated or misbranded is illegal to sell. 21 U.S.C. § 331(a). Adulterated and misbranded products thus have no economic value and are legally worthless.

23. The Illinois Food, Drug and Cosmetic Act ("IL FDCA") has expressly adopted the federal labeling requirements as its own. The definition of "adulterated" as defined by 410 ILCS 620/14 is exactly the same as the FDCA.

24. The presence of benzene renders the Products adulterated *and* misbranded. As alleged above, benzene is a poisonous and deleterious substance that has been linked to cancer and is dangerous at any level. The Products were also manufactured in such an insanitary way that they became contaminated with benzene. Thus, the Products are adulterated.

25. The Products' labeling also failed to disclose the existence of benzene in the Products, and the ingredients section of the Products' labeling does not list "benzene" as an ingredient. Further, the Products' labeling does not disclose the presence of benzene, even though a warning statement concerning benzene is necessary or appropriate to prevent a health hazard. 21 C.F.R. § 740.1(a). Therefore, the Products are also "misbranded."

26. As a manufacturer, distributor, and seller of cosmetics products, Defendant has a duty to ensure its Products did not contain excessive (or any) levels of benzene, including through regular testing. But based on Valisure's testing results set forth above, Defendant made no reasonable effort to test its Products for benzene or other impurities. Nor did it disclose to Plaintiff or any other consumers in any product advertising, labeling, packaging, or marketing that its dry shampoo Products contained benzene, in some instances many multiples beyond the emergency interim limit set by the FDA. To the contrary, Defendant represented and warranted, expressly and impliedly, that the Products safe and effective for their intended use, were of merchantable

quality, complied with federal and state law, and did not contain carcinogens, reproductive toxins, or other impurities such as benzene.

27.     If Defendant had fulfilled its quality assurance obligations, Defendant would have identified the presence of the benzene contaminant almost immediately.

28.     Further, had Defendant adequately tested its Products for benzene and other carcinogens, reproductive toxins, and impurities, it would have discovered the Products contained benzene at levels above the FDA's limit (to the extent even applicable), making those products ineligible for distribution, marketing, and sale.

29.     Accordingly, Defendant knowingly, or at least negligently, introduced contaminated, adulterated, and/or misbranded Products containing dangerous amounts of benzene into the U.S. market.

30.     Defendant also knew or should have known about the carcinogenic potential of benzene because benzene is classified as a Group 1 compound by the World Health Organization and the International Agency for Research on Cancer, meaning that it is "carcinogenic to humans." In addition, in the last year, numerous manufacturers have issued recalls of their products due to the presence of benzene.  Defendant should therefore have been on high alert to test its Products for the presence of benzene.

31.     When Plaintiff purchased Defendant's Products, Plaintiff did not know, and had no reason to know, that Defendant's Products were adulterated and misbranded and thus unlawful to sell as set forth herein.  Not only would Plaintiff not have purchased Defendant's Products at all had she known the Products contained or risked containing benzene, she would not have been capable of purchasing them if Defendant had done as the law required and tested the Products for benzene and other carcinogens, reproductive toxins, and impurities, because the Products would

have been deemed adulterated and misbranded, and therefore illegal to sell.

32. Moreover, no reasonable consumer would have paid any amount for products containing benzene, a known carcinogen and reproductive toxin, much less above the limits set by the FDA (even assuming those allowances apply to Defendant's products).

33. Thus, if Plaintiff and Class members had been informed that Defendant's Products contained or may contain benzene, they would not have purchased or used the Products at all, or would have paid significantly less for the Products, making such omitted facts material to them.

34. Plaintiff and Class members were injured by the full purchase price of the Products because the Products are worthless, as they are adulterated and misbranded due to the presence of harmful levels of benzene. Such illegally sold products are worthless and have no value. *See Barnes v. Unilever United States Inc.*, 2022 WL 2915629, at *1-3 (N.D. Ill. July 24, 2022); *Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1085 (11th Cir. 2019); *see also In re Valsartan, Losartan, & Irbesartan Prod. Liab. Litig.*, 2021 WL 222776, at *16 (D.N.J. Jan. 22, 2021).

35. Further, Plaintiff and Class Members bargained for a dry shampoo product free of contaminants and dangerous substances, and were deprived the basis of their bargain when Defendant manufactured and sold them products containing or at risk of containing the dangerous substance benzene. Had Defendant not misrepresented that the Products did not contain or were not at risk of containing benzene, and/or had Defendant not failed to disclose that the Products contained or were at risk of containing benzene, Plaintiff and Class Members would not have purchased the Products or would not have paid as much for the Products based on these misrepresentations or omissions.

36. Plaintiff and Class members are entitled to damages for the monies paid to purchase

the Products, statutory and punitive damages, attorneys' fees and costs, and injunctive relief.

37.     Plaintiff brings this action on behalf of herself and the Class for equitable relief and to recover damages and restitution for: (i) violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA") 815 ILCS 505/1, *et seq.*; (ii) fraud; (iii) unjust enrichment, and (iv) violations of the state consumer fraud acts.

## **PARTIES**

38.     Plaintiff Emily Evans is a resident of Chicago, Illinois and has an intent to remain there, and is therefore a citizen of Illinois.  In or about August 2022, Ms. Evans purchased a canister of Defendant's Not Your Mother's Clean Freak Refreshing Dry Shampoo Original from a CVS in Chicago, Illinois.  When purchasing the product, Ms. Evans reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the Defendant that the product was properly manufactured, free from defects, safe for its intended use, not adulterated or misbranded, and legal to sell.  Ms. Evans relied on these representations and warranties in deciding to purchase the product manufactured and sold by Defendant, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased the product from Defendant if she had known that it was not, in fact, properly manufactured, free from defects, safe for its intended use, adulterated and misbranded, and legal to sell.  The Not Your Mother's dry shampoo product Ms. Evans purchased was contaminated with benzene, therefore rendering it improperly manufactured, defective, not safe for its intended use, adulterated and misbranded, and illegal to sell.  Thus, Ms. Evans was injured in two ways by Defendant.  *First*, Ms. Evans purchased an adulterated and misbranded product that was illegally sold to her, and therefore worthless.  *Second*, Ms. Evans was deceived by Defendant's representations and omissions regarding the presence of benzene in the Product.

39.    Defendant is a Florida limited liability company with its principal place of business located in Lutz, Florida.  Defendant manufactures, markets, and sells Not Your Mother's brand dry shampoo products throughout the State of Illinois and the United States. Including in both retail establishments and online.

## JURISIDICTION AND VENUE

40.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

41.    This Court has personal jurisdiction over Defendant because Plaintiff purchased the Products in this District.

42.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred within this District, Defendant has marketed, advertised, and sold the Products in this District, and Defendant has caused harm to Plaintiff and other Class members in this District.

## CLASS ACTION ALLEGATIONS

43.    Plaintiff seeks to represent a class defined as all persons in the United States who purchased the Products for personal or household use within any applicable limitations period (the "Class").

44.    Plaintiff also seeks to represent a subclass of all Class Members who purchased the Products for personal or household use in Illinois within any applicable limitations period (the "Illinois Subclass").

45.     Plaintiff also seeks to represent a subclass of all Class Members who purchased the Products for personal or household use in California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, or Washington within any applicable limitations period (the "Consumer Fraud Multi-State Subclass").[17]

46.     The Class and Subclasses are collectively referred to as the "Classes."

47.     Subject to additional information obtained through further investigation and discovery, the foregoing definitions of the Classes may be expanded or narrowed by amendment to the complaint or narrowed at class certification.

48.     Specifically excluded from the Classes are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or Defendant's officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

49.     **Numerosity.** The members of the proposed Classes are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable. Upon information and belief, Plaintiff reasonably estimates that there are hundreds of thousands of individuals that are members of the proposed Classes. Although the precise number of proposed members are unknown to Plaintiff, the true number of members of the Classes are known by

---

[17] While discovery may alter the following, the states in the Consumer Fraud Multi-State Class are limited to those states with similar consumer fraud laws under the facts of this case: California (Cal. Bus. & Prof. Code § 17200, *et seq.*); Florida (Fla. Stat. § 501.201, *et seq.*); Illinois (815 Ill. Comp. Stat. 505/1, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich. Comp. Laws § 445.901, *et seq.*); Minnesota (Minn. Stat. § 325F.67, *et seq.*); Missouri (Mo. Rev. Stat. § 407.010, *et seq.*); New Jersey (N.J. Stat. § 56:8-1, *et seq.*); New York (N.Y. Gen. Bus. Law §§ 349 and 350); and Washington (Wash. Rev. Code § 19.86.010, *et seq.*).

Defendant.  Members of the Classes may be notified of the pendency of this action by mail and/or publication through the distribution and sales records of Defendant and third-party retailers and vendors.

50.  **Typicality.**  The claims of the representative Plaintiff are typical of the claims of the Classes in that the representative Plaintiff, like all members of the Classes, purchased the Products, which were worthless due to the presence of benzene, a harmful and carcinogenic chemical impurity.  The representative Plaintiff, like all members of the Classes, has been damaged by Defendant's misconduct in the very same way as the members of the Classes.  Further, the factual bases of Defendant's misconduct are common to all members of the Classes and represent a common thread of misconduct resulting in injury to all members of the Classes.

51.  **Existence and predominance of common questions of law and fact.**  Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting only individual members of the Classes.  These common legal and factual questions include, but are not limited to, the following:

> (a)  whether the Products manufactured, distributed, and sold by Defendant contain dangerously high levels of benzene, thereby breaching the express and implied warranties made by Defendant and making the Products unfit for human use and therefore unfit for her intended purpose;
>
> (b)  whether Defendant knew or should have known the Products contained or were at risk of containing elevated levels of benzene prior to selling them, thereby constituting fraud and/or fraudulent concealment;
>
> (c)  whether Defendant is liable to Plaintiff and the Classes for unjust

enrichment;

(d)   whether Defendant is liable to Plaintiff and the Classes for fraud;

(e)   whether Plaintiff and the Classes have sustained monetary loss and the proper measure of that loss;

(f)   whether Plaintiff and the Classes are entitled to declaratory and injunctive relief;

(g)   whether Plaintiff and the Classes are entitled to restitution and disgorgement from Defendant; and

(h)   whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are deceptive.

52.   **Adequacy of Representation.**   Plaintiff will fairly and adequately protect the interests of the Classes.  Plaintiff has retained counsel who are highly experienced in complex consumer class action litigation, and Plaintiff intends to vigorously prosecute this action on behalf of the Classes.  Plaintiff has no interests that are antagonistic to those of the Classes.

53.   **Superiority.**  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by members of the Classes are relatively small compared to the burden and expense of individual litigation of her claims against Defendant.  It would, thus, be virtually impossible for members of the Classes, on an individual basis, to obtain effective redress for the wrongs committed against them.  Furthermore, even if members of the Classes could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this

action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

54. In the alternative, the Classes may be certified because:

    (a)    the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual members of the Classes that would establish incompatible standards of conduct for the Defendant;

    (b)    the prosecution of separate actions by individual members of the Classes would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other members of the Classes not parties to the adjudications, or substantially impair or impede her ability to protect her interests; and/or

    (c)    Defendant has acted or refused to act on grounds generally applicable to the Classes as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

## CAUSES OF ACTION

### COUNT I
**Violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act**
**815 ILCS 505/1, *et seq.***
**(On Behalf of Plaintiff and the Illinois Subclass)**

55. Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

56. Plaintiff brings this claim individually and on behalf of the members of the proposed Illinois Subclass against Defendant.

57. Plaintiff and other Illinois Subclass Members are persons within the context of the Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA"), 815 ILCS 505/1(c).

58. Defendant is a person within the context of the ICFA, 815 ILCS 505/1(c).

59.     At all times relevant hereto, Defendant was engaged in trade or commerce as defined under the ICFA, 815 ILCS 505/1(f).

60.     Plaintiff and the proposed Illinois Subclass are "consumers" who purchased the Products for personal, family or household use within the meaning of the ICFA, 815 ILCS 505/1(e).

61.     The ICFA does not apply to "[a]ctions or transactions specifically authorized by laws administered by any regulatory body or officer of this State or the United States." 815 ILCS 505/10b(1).

62.     The FDCA prohibits introduction into interstate commerce "of any food, drug, or cosmetic that is adulterated or misbranded." 21 U.S.C. § 331(a).

63.     As the Products are adulterated and misbranded, the FDCA specifically prohibits their introduction into interstate commerce, and thus, actions under the ICFA related to the Products being adulterated and misbranded are not barred by 815 ILCS 505/10b(1).

64.     The ICFA prohibits engaging in any "unfair or deceptive acts or practices … in the conduct of any trade or commerce." ICFA, 815 ILCS 505/2.

65.     The ICFA prohibits any deceptive, unlawful, unfair, or fraudulent business acts or practices including using deception, fraud, false pretenses, false promises, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact, or the use or employment of any practice described in Section 2 of the Uniform Deceptive Trade Practices Act ("UDTPA"). 815 ILCS § 505/2.

66.     Plaintiff and the other Illinois Subclass Members reasonably relied upon Defendant's representation that the Products were safe for personal use and, due to Defendant's omission of the presence of benzene in the Products, Plaintiff read and relied on Defendant's

labeling to conclude that the Products were not contaminated with any dangerous substance, including benzene.

67.     Defendant's conduct, as described herein, took place within the State of Illinois and constitutes unfair or deceptive acts or practices in the course of trade and commerce, in violation of 815 ICFA 505/1, *et seq.*

68.     Defendant engaged in unfair conduct in violation of the ICFA, including but not limited to selling adulterated and misbranded products in violation of the FDCA and IL FDCA. *Barnes v. Unilever United States Inc.*, 2022 WL 2915629, at *3 (N.D. Ill. July 24, 2022).

69.     Defendant engaged in deceptive conduct, including but not limited to misrepresenting that the Products did not contain or did not risk containing benzene, and failing to disclose that the Products contained or risked containing benzene.

70.     Defendant violated the ICFA by representing that the Products have characteristics or benefits that they do not have. 815 ILCS § 505/2; 815 ILCS § 510/2(7).

71.     Defendant advertised the Products with intent not to sell them as advertised, in violation of 815 ILCS § 505/2 and 815 ILCS § 510/2(9).

72.     Defendant engaged in fraudulent and/or deceptive conduct which creates a likelihood of confusion or of misunderstanding in violation of 815 ILCS § 505/2; 815 ILCS § 510/2(3).

73.     Prior to placing the Products into the stream of commerce and into the hands of consumers to use on their bodies, Defendant knew or should have known that the Products contained benzene, but Defendant not only failed to properly test and quality-check its Products, but further misrepresented, omitted, and concealed this fact to consumers, including Plaintiff and

Illinois Subclass Members, by not including benzene or the risk of benzene contamination on the Products' labels or otherwise warning about its presence.

74.    Defendant intended that Plaintiff and each of the other Illinois Subclass Members would reasonably rely upon the misrepresentations, misleading characterizations, warranties and material omissions concerning the true nature of the Products.

75.    Given Defendant's position in the health and beauty market as an industry leader, Plaintiff and reasonable consumers trusted and relied on Defendant's representations and omissions regarding the presence of benzene in the Products.

76.    Defendant's misrepresentations, concealment, omissions, and other deceptive conduct were likely to deceive and cause misunderstanding and/or in fact caused Plaintiff and each of the other Illinois Subclass Members to be deceived about the true nature of the Products.

77.    Plaintiff and Illinois Subclass Members have been damaged as a proximate result of Defendant's unfair and deceptive violations of the ICFA and have suffered damages as a direct and proximate result of purchasing the Products.

78.    As a direct and proximate result of Defendant's violations of the ICFA, as set forth above, Plaintiff and the Illinois Subclass Members have suffered ascertainable losses of money caused by Defendant's unfair conduct of selling adulterated, misbranded, and illegally sold Products, and its misrepresentations and material omissions regarding the presence of benzene in the Products.

79.    Had they been aware of the true nature of the Products, Plaintiff and the Illinois Subclass Members either would have paid less for the Products or would not have purchased them at all.

80.    Based on Defendant's unfair and/or deceptive acts or practices, Plaintiff and the

Illinois Subclass Members are therefore entitled to relief, including restitution, actual damages, treble damages, punitive damages, costs, and attorneys' fees, under 815 ILCS 505/10a.

### COUNT II
**Fraud**
**(On Behalf of Plaintiff and the Classes)**

81.     Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

82.     Plaintiff brings this claim individually and on behalf of the members of the Classes against Defendant.

83.     Defendant made fraudulent misrepresentations and omissions to Plaintiff and members of the Classes regarding the Products, specifically that the Products contained only the active and inactive ingredients stated on the label, and not harmful impurities such as benzene. Defendant also materially omitted facts from Plaintiff and members of the Classes, including that the Products in fact contained (or risked containing) harmful levels of benzene.

84.     Defendant had a duty to disclose material facts to Plaintiff and the Classes given that Plaintiff and the Classes were the intended users of the Products.  Defendant also had a duty to disclose material facts to Plaintiff and the Classes, namely that it was in fact manufacturing, distributing, and selling harmful products unfit for human use, because Defendant had superior knowledge such that the transactions without the disclosure were rendered inherently unfair.

85.     Defendant knew or should have known that the Products were contaminated with benzene, but continued to manufacture, distribute, and sell them nonetheless.  Defendant was required to engage in impurity testing to ensure that harmful impurities such as benzene were not present in the Products.  Had Defendant undertaken proper testing measures, it would have been aware that the Products contained dangerously high levels of benzene.  During this time, Plaintiff

and members of the Classes were using the Products without knowledge that the Products contained dangerous levels of benzene.

86.     Defendant failed to discharge its duty to disclose these material facts.

87.     In so failing to disclose these material facts to Plaintiff and the Classes, Defendant intended to hide from Plaintiff and the Classes that they were purchasing and using the Products with harmful defects that were unfit for human use, and thus acted with scienter and/or an intent to defraud.

88.     Plaintiff and the Classes reasonably relied on Defendant's failure to disclose insofar as they would not have purchased the defective Products manufactured and sold by Defendant had they known the Products contained unsafe levels of benzene.

89.     As a direct and proximate cause of Defendant's fraudulent concealment, Plaintiff and the Classes suffered damages in the amount of monies paid for the defective Products.

90.     As a result of Defendant's willful and malicious conduct, punitive damages are warranted.

<u>**COUNT III**</u>
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Classes)**

91.     Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

92.     Plaintiff brings this claim individually and on behalf of the members of the Classes against Defendant.

93.     This claim is brought under the laws of the State of Illinois.

94.     Plaintiff and the Classes conferred a benefit on Defendant in the form of monies paid to purchase Defendant's defective and worthless Products.

95.    Defendant voluntarily accepted and retained this benefit.

96.    Because this benefit was obtained unlawfully, namely by selling and accepting compensation for products unfit for human use, it would be unjust and inequitable for Defendant to retain the benefit without paying the value thereof.

## COUNT IV
### Violation of State Consumer Fraud Acts
**(On Behalf of Plaintiff and the Consumer Fraud Multi-State Subclass)**

97.    Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

98.    Plaintiff brings this claim individually and on behalf of the members of the Consumer Fraud Multi-State Subclass against Defendant.

99.    The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Subclass prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

100.    Plaintiff and Consumer Fraud Multi-State Subclass Members have standing to pursue a cause of action for violation of the Consumer Fraud Acts of the states in the Consumer Fraud Multi-State Subclass because Plaintiff and Consumer Fraud Multi-State Subclass Members have suffered an injury in fact and lost money as a result of Defendant's actions set forth herein.

101.    Defendant engaged in unfair conduct, including but not limited to selling adulterated and misbranded products in violation of the FDCA.

102.    Defendant engaged in deceptive conduct, including but not limited to misrepresenting that the Products did not contain or did not risk containing benzene, and failing to disclose that the Products contained or risked containing benzene.

103. Defendant intended that Plaintiff and Consumer Fraud Multi-State Subclass Members would rely upon its unfair and deceptive conduct and a reasonable person would in fact be misled by this deceptive conduct described above.

104. Given Defendant's position in the health and beauty market as an industry leader, Plaintiff and reasonable consumers trusted and relied on Defendant's representations and omissions regarding the presence of benzene in the Products.

105. As a result of Defendant's use or employment of unfair or deceptive acts or business practices, Plaintiff and Consumer Fraud Multi-State Subclass Members have sustained damages in an amount to be proven at trial.

106. In addition, Defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests, individually and on behalf of the alleged Classes, that the Court enter judgment in her favor and against Defendant as follows:

(a) For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as the representative for the Classes, and naming Plaintiff's attorneys as Class Counsel to represent the Classes;

(b) For an order declaring that Defendant's conduct violates the causes of action referenced herein;

(c) For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(d) For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e) For prejudgment interest on all amounts awarded;

(f) For an order of restitution and all other forms of equitable monetary relief;

(g)     For injunctive relief as pleaded or as the Court may deem proper; and

(h)     For an order awarding Plaintiff and the Classes her reasonable attorneys' fees and expenses and costs of suit.

### DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated:  November 10, 2022                    Respectfully Submitted,

By: */s/ Carl V. Malmstrom*
        Carl V. Malmstrom

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC**
111 W. Jackson Blvd., Suite 1700
Chicago, IL 60604
Tel: (312) 984-0000
Fax: (212) 686-0114
E-mail: malmstrom@whafh.com

*Local Counsel for Plaintiff*

**BURSOR & FISHER, P.A.**
Max S. Roberts
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
E-Mail: mroberts@bursor.com

**BURSOR & FISHER, P.A.**
Sarah N. Westcot (*pro hac vice* forthcoming)
Stephen A. Beck (*pro hac vice* forthcoming)
Jonathan L. Wolloch (*pro hac vice* forthcoming)
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile:  (305) 676-9006
E-Mail: swestcot@bursor.com
            sbeck@bursor.com

jwolloch@bursor.com

*Attorneys for Plaintiff*